UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FLAMUR GJINI, as administrator of the
estate of Arbnor Gjini, deceased,

                                    Plaintiff,

                v.

UNITED STATES OF AMERICA,

                                    Defendant.

No. 16-CV-3707 (KMK)

OPINION & ORDER

Appearances:

Stephan E. Seeger, Esq.
Sherman, Richichi & Hickey, LLC
Stamford, CT
*Counsel for Plaintiff*

Tomoko Onozawa, Esq.
Jennifer A. Jude, Esq.
U.S. Attorney's Office
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Flamur Gjini ("Plaintiff"), as administrator of the estate of his deceased younger brother,

Arbnor Gjini ("Decedent"), brings this Action against the United States of America

("Defendant" or "United States"), for medical malpractice or negligence, and failure to protect

pursuant to the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 1402(b), 2401(b),

and 2671–80. (Compl. (Dkt. No. 11).)[1] Defendant now moves for summary judgment. (Not. of

---

[1] Plaintiff initially named Patricia Griffin ("Dr. Griffin"), Jennifer Bowe ("Bowe"), and
Dr. Diane Sommer ("Dr. Sommer") as Defendants in their individual capacity as well. (*See*
Compl.) Plaintiff agreed to the dismissal of all claims against Dr. Griffin, Bowe, and Dr.
Sommer, leaving the United States as the sole Defendant in this case. (*See* Dkt. Nos. 40, 49.)

Mot. (Dkt. No. 66).) For the reasons stated below, Defendant's Motion for Summary Judgment is granted in part and denied in part.

## I. Background

### A. Factual Background

#### 1. Decedent's Suicide

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically the United States' 56.1 Statement, (Def.'s Local Rule 56.1 Statement of Material Facts ("Def.'s 56.1") (Dkt. No. 71)), Plaintiff's 56.1 Response and Additional Material Facts (Pl.'s Local Rule 56.1 Response and Additional Material Facts ("Pl.'s 56.1") ("Pl.'s Additional 56.1") (Dkt. No. 72-8)),[2] and the United States' Counterstatement (Def.'s. Rule 56.1 Counterstatement ("Def.'s 56.1 Counter") (Dkt. No. 76)), and the admissible evidence submitted by the Parties. The facts are recounted "in the light most favorable to" Plaintiff, the non-movant. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (citation and quotation marks omitted).[3] The facts as described below are in dispute only to the extent indicated.[4]

---

[2] Plaintiff submitted one document containing both its 56.1 Response and 56.1 Additional Material Facts at Dkt. No. 72-8. To avoid confusion with respect to paragraph numbering, the Court references Plaintiff's Response and Additional Facts separately. Plaintiff's Additional Facts begin on page six of Dkt. No. 72-8.

[3] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).

[4] Where the Parties identify disputed facts but with semantic objections only or by

On August 7, 2009, Decedent was sentenced in the United States District Court for the

District of Connecticut to a 168-month term of imprisonment with a five-year term of

supervision for Possession With Intent to Distribute 500 Grams or More of Cocaine and Cocaine

Base, in violation of 21 U.S.C. § 841.  (Def.'s 56.1 ¶ 1.)  Decedent arrived at Federal

Correctional Institution ("FCI") Otisville on January 6, 2010, and remained in federal custody

there until his death on May 21, 2013.  (*Id.* at ¶ 2.)

On January 6, 2010, the day Decedent arrived at FCI Otisville, he underwent a physical

intake Examination that revealed no medical issues, no mental health complaints, and no history

of suicide attempts.  (Decl. of Tomoko Onozawa, Esq. ("Onozawa Decl.") Ex. D, at BOP-00022

to BOP-00025 (Decedent's Bureau of Prisons ("BOP") Medical Records ("Decedent Med.

Rec.")) (Dkt. No. 70).)[5]  On January 19, 2010, Decedent underwent a mental health intake

_____

asserting irrelevant facts, these purported disputes, which do not actually challenge the factual
substance described in the relevant paragraphs, the Court will not consider them as creating
disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported
denials—and a number of his admissions—improperly interject arguments and/or immaterial
facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants'
asserted facts without specifically controverting those same facts. . . .  [A] number of [the]
[p]laintiffs' purported denials quibble with [the] [d]efendants' phraseology, but do not address
the factual substance asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent.
Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining
that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments
and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically
controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular
fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-
CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1
statement "does not comply with the rule" because "it adds argumentative and often lengthy
narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions
[the] plaintiff has been compelled to make").
　　　The Court notes that the United States does not dispute the substance of most of
Plaintiff's additional 56.1 statements, but improperly interjects the argument that the statements
are not material to the legal questions at issue in this Motion.  (*See* Def.'s 56.1 Counter ¶¶ 1–31.)

　　　[5] Where possible, the Court has relied on the undisputed facts in the Parties' 56.1
statements.  However, direct citations to the record have also been used where relevant facts

screening performed by a staff psychologist, who noted that he had a history of substance abuse, but that his mental health was otherwise unremarkable. (Onozawa Decl., Ex. E, at BOP-00128 (Decedent's BOP Psych. Data Sys. Rec. ("Decedent Psych. Rec.")).) Decedent reported no history of suicidal ideation, mental illness, self-destructive behavior, or physical or sexual abuse. (*Id*.)

At all times relevant to the Complaint, Dr. Griffin was a staff psychologist who held the title of Drug Abuse Program Coordinator with the Psychology Department at FCI Otisville. (Def.'s 56.1 ¶ 3.) At all times relevant to the Complaint, Dr. Sommer was the Clinical Director of the Health Services Department. (*Id*. at ¶ 4.) She was a qualified medical physician on staff and was trained in recognizing symptoms of psychiatric disorders. (Pl.'s Additional 56.1 ¶ 9.)

From January 2010 to March 2013, Decedent had no encounters with Psychology Department staff and very few encounters with medical staff. (Def.'s 56.1 ¶ 6.) On March 21, 2013, Decedent had an annual physical examination, in which he reported that he had a good appetite, exercised regularly and slept well, and denied having excessive feelings of stress, anxiety, or depression. (Decedent Med. Rec. BOP-00077 to BOP-00080.)

On May 5, 2013, Decedent refused to return to his housing unit and told staff that he felt unsafe on the compound. (Def.'s 56.1 ¶ 7.) On May 5, 2013, Decedent was placed in the Special Housing Unit ("SHU"). (*Id*. at ¶ 8.)

On May 6, 2013, Dr. Griffin was informed that Decedent "was acting strangely." (Pl.'s Additional 56.1 ¶ 1.) She met with Decedent and learned from him that he did not feel safe and he felt like he was "losing his mind." (*Id*.) Dr. Griffin described his presentation as "paranoid

were not included in any of the Parties' Rule 56.1 submissions, or where the Parties dispute each other's characterization of the record.

and delusional." (Def.'s 56.1 ¶ 9.) At this meeting Decedent told Dr. Griffin about several "stressors in his life," including having problems with his daughter's mother, who refused to bring his daughter to visit, his cellmate being scheduled for release from prison, his cousin "bl[owing] trial," and tensions with an unnamed inmate. (Decedent Psych. Rec. BOP-00124.) Decedent further told Dr. Griffin that he spoke to someone who spoke to the inmate he allegedly had issues with, and that the inmate told Decedent not to worry, but that after this Decedent started feeling paranoid and as though the other inmates were talking about him and accusing him of being "a rat." (*Id*.) Dr. Griffin also spoke to some of Decedent's friends who told her he had been "decompensating and acting strangely." (*Id*.) His friends believed that the impending release of Decedent's cellmate was "pushing him over the edge." (*Id*.) At the conclusion of the visit, Dr. Griffin arranged for Decedent to be transferred out of the SHU to Housing Unit "FB," where Decedent had friends who could look out for him. (Def.'s 56.1 ¶ 10.) Decedent did not report any physical or sexual harassment or incidents of sexual assault to Dr. Griffin. (*Id*. at ¶ 11.)

That same day, on May 6, 2013, Dr. Griffin sent her report to Health Services and requested that Decedent be scheduled to see a psychiatrist. (Pl.'s Additional 56.1 ¶ 4.) The psychiatrist was not available until May 19, 2013, so Dr. Griffin noted that she would "see if [Decedent] could get something sooner." (*Id*.)

On May 7, 2013, Dr. Griffin went to SHU to inform Decedent that arrangements were made for him to transfer to Housing Unit FB. (Decedent Psych. Rec. BOP-00123.) She reported that "[h]e listened, processed it, understood, and was in agreement . . . . He was happy about this plan." (*Id*.) On May 8, 2013, Dr. Griffin called Decedent's new unit and was told by an officer that Decedent was "doing fine" and that there was "no indication of any problems." (*Id*. at BOP-

00122.)  She also spoke with an inmate from the unit who was familiar with Decedent and he reported that Decedent was "doing well, understands, speaking fine and functioning appropriately.  He said he is delusional but able to function and it seems like he is relaxing and doing better."  (*Id.*)

On May 19, 2013, the psychiatrist was on the premises at FCI Otisville, but he did not see Decedent on that day because Decedent was not put on the list of inmates to be seen, contrary to Dr. Griffin's request of May 6, 2013.  (Pl.'s Additional 56.1 ¶ 5.)  On May 21, 2013, Dr. Griffin spoke with the psychology orderly, who was a friend of Decedent's, and learned that Decedent did not see a psychiatrist on May 19, 2013 and that he was "acting strange, depressed[,] and hearing voices." (Decedent Psych. Rec. BOP-00120.)  Dr. Griffin also learned that Decedent had not gone to lunch in a few days "because he thought that the people he sits with have something against him."  (*Id.*)  She also learned from Health Services that the psychiatrists would not be back until June 9, 2013.  (*Id.*)

On May 21, 2013, Dr. Griffin had a one-hour meeting with Decedent starting at 12:30 p.m.  (Def.'s 56.1 ¶ 13.)  Dr. Griffin asked Decedent how he was doing and relayed that his friends had been concerned about him.  Decedent said he was "okay," but "spoke about sinking into a depression."  (Decedent Psych. Rec. BOP-00120.)  Dr. Griffin asked Decedent if "he had thoughts about hurting himself."  (*Id.*)  He "shook his head in a convincing manner," and replied, "no, none of those thoughts."  (*Id.*)  Dr. Griffin also asked Decedent about the voices he was hearing.  (*Id.*)  He "denied hearing voices" and said, "I know that it's me."  (*Id.*)  Decedent also spoke vaguely about "memories of past mistakes" and told Dr. Griffin that he thought "other inmates [were] talking about him," though he "did not give specifics and remained vague."  (*Id.* at BOP-00120 to BOP-00121.)  Decedent also told Dr. Griffin that his friends had "watched over

him since he got out of SHU," "fed him, checked on him[,] and encouraged him." (*Id.* at BOP-00121.) Dr. Griffin told Decedent that she would contact Dr. Sommer about getting medications for him. (*Id.*) They also developed a plan where he agreed to read, continue exercising, go to Muslim prayer services, spend time with his friends, and see her again the following day. (*Id.*) Later that afternoon, Dr. Griffin passed Decedent in the hallway, and he thanked her "for helping him." (*Id.*)

Dr. Sommer could receive communications regarding inmate patients directly through a physician assistant, notes in her mailbox, email, and telephone calls. (Pl.'s Additional 56.1 ¶ 10.) On May 21, 2013, Dr. Griffin tried calling Dr. Sommer but there was no answer. She then sent her an email stating: "I had sent a referral on [Decedent] to see the psychiatrist on the 19th and he wasn't on the list. He is now decompensated and depressed and hearing voices. Shall I send him to you so you can call the psychiatrist and start him on something?? O[r], maybe you could start him on something to help with the voices. He needs something." (*Id.* at ¶ 7.)

On May 21, 2013, Dr. Sommer arrived at work at approximately 8:00 a.m. and started her day with a short meeting followed by seeing patients. (Pl.'s Additional 56.1¶ 15.) Dr. Sommer's phone was not in the patient exam room, but in her office. Consequently, she did not check her voice mail prior to Decedent's death because she was seeing patients. (*Id.* at ¶ 16.) Similarly, Dr. Sommer did not check her e-mails until the end of the day, as was her usual practice. (*Id.* at ¶ 17.) On that day, Dr. Sommer wore a radio that could have been used to contact her in case of an emergency. (Decl. of Stephan E. Seeger, Esq. ("Seeger Decl.") Ex. 5, at 54 (Transcript of

Deposition of Dr. Sommer ("Dr. Sommer Dep.") (Dkt. No. 72-7).)[6] Dr. Sommer does not recall being contacted by radio regarding Decedent's condition on May 21, 2013. (Dr. Sommer Dep. 54.) Dr. Sommer testified that if she was sick or unavailable, she would have another physician from another institution on call. (*Id*.) She further testified that if somebody needed to communicate something related to a patient's treatment to her by phone or email, she probably would not receive that communication until the end of the day. (*Id*. at 57.) Dr. Sommer did not see or read the e-mail that Dr. Griffin sent her regarding Decedent until after his death. (Pl.'s Additional 56.1 ¶ 24.) Dr. Sommer did not interact with Decedent while he was incarcerated at FCI Otisville. (Def.'s 56.1 ¶ 5.)

In 2013, Dr. Sommer was the only physician on staff at FCI Otisville, (Pl.'s Additional 56.1 ¶ 13), even though FCI Otisville's warden was informed of the need for an additional physician, (*id*. at ¶ 14). At all relevant times the psychology department at FCI Otisville was independent of the Health Services department. (*Id*. at ¶ 21.) Only the Health Services department could prescribe medication. (*Id*.) Dr. Sommer had the authority and ability to help Decedent see a psychiatrist and had the authority to put him on the list to see the psychiatrist, unlike Dr. Griffin who did not have such authority. (*Id*. at ¶ 22.) Dr. Sommer did not put Decedent on the list to see a psychiatrist on May 19, 2013. (*Id*. at ¶ 23.)

FCI Otisville did not have a psychiatrist on staff or on call. (Dr. Sommer Dep. 72). Instead, it had a contract psychiatrist. (*Id*.) Dr. Sommer testified that if someone had an immediate psychiatric issue it would be dealt with through "medical" and she would be involved

---

[6] Although Mr. Seeger's declaration is at Dkt. No. 72-7, Plaintiff attaches the transcript of Dr. Sommer's deposition at Dkt. No. 72-5.

in that process.  (*Id*.)  She could call in the BOP psychiatrist if she needed to.  (*Id*.)  The

psychiatrist would come "every few weeks."  (*Id*. at 73.)

At approximately 3:30 p.m. on May 21, 2013, Decedent was found dead in his cell after a

suicide, which was confirmed by an autopsy.  (Def.'s 56.1 ¶ 14.)

### 2.  Decedent's Alleged Sexual Assault

Plaintiff claims that, during one of his visits with Decedent in or around April 2013,

Decedent told him that an unnamed inmate had been "picking on him . . . trying to start

something with him every time he [saw] him."  (Def.'s 56.1 ¶ 15.)  Decedent refused to tell

Plaintiff the name of the inmate who was allegedly harassing him.  (*Id*. at ¶ 16.)  Decedent told

Plaintiff, "he got me," which Plaintiff understood to mean that the unnamed inmate had raped

Decedent.  (*Id*. at ¶ 20.)  According to Plaintiff, Decedent also complained about the unnamed

inmate to unnamed BOP personnel, who "transferred him into the [SHU]" at Decedent's request,

because Decedent "wasn't feeling safe."  (*Id*. at ¶ 17.)  Plaintiff asserts that Decedent asked to be

transferred out of the SHU and into Housing Unit FB, because another inmate told Decedent that

"he would be safe" there.  (*Id*. at ¶ 18.)  During this visit, Decedent also told Plaintiff that the

unnamed inmate had "grabbed him one time and grabbed him in the cell" either before or after

Decedent was in the SHU.  (*Id*. at ¶ 19.)[7]  When Plaintiff asked Decedent where BOP personnel

were at the time of the assault by the other inmate, Decedent vaguely replied, "Oh, they don't

_____

[7] The Parties have attached possibly inadmissible portions of Plaintiff's deposition
transcript as exhibits to their 56.1 statements and repeatedly cite to the transcript in their
memoranda of law.  No Party has objected to the admissibility of Plaintiff's statements.  The
Court therefore considers Plaintiff's statements about his conversations with Decedent in
deciding the pending Motions for Summary Judgment.  *See Capobianco v. City of New York*, 422
F.3d 47, 55 (S.D.N.Y. 2005) ("[I]nadmissible documents may be considered by the court if not
challenged.  The objection must be timely or it will be deemed to have been waived." (citation
and quotation marks omitted)).

pay no mind, they don't care." (*Id*. at ¶ 21.) Decedent did not tell Plaintiff that BOP personnel witnessed the alleged attack, did not identify any BOP personnel who may have seen the alleged attack, and did not describe what, if anything, BOP personnel knew about the alleged attack. (*Id*. at ¶ 22.) Plaintiff told Decedent to report the alleged assault, urged him to "get out of the situation," and directed him "to stay away from" the alleged rapist. (*Id*. at ¶ 23.) Plaintiff claims Decedent told him that, after he was transferred into Housing Unit FB, the unidentified inmate learned from unidentified BOP personnel that Decedent had complained about him, and the inmate "all of a sudden" started calling Decedent a "snitch." (*Id*. at ¶ 24.)

Plaintiff did not verify whether FCI Otisville personnel were aware of Decedent's alleged fear for his life and physical safety. (Def.'s 56.1 ¶ 26.) Plaintiff did not notify BOP of the alleged rape. (*Id*. at ¶ 27.) Plaintiff does not know whether Decedent ultimately reported the alleged rape to anyone at FCI Otisville. (*Id*. at ¶ 29.) Plaintiff does not have any photographic or documentary evidence about any physical or sexual abuse that Decedent suffered. (*Id*. at ¶ 30.)

Decedent's medical records at FCI Otisville show no injuries consistent with, or allegations concerning, assault. (*Id*. at ¶ 31.) Decedent did not present any issues of concern through the BOP's Administrative Remedy Program. (*Id*. at ¶ 32.) The Special Investigative Services Department at FCI Otisville, which is responsible under BOP policy for investigating allegations of sexual abuse, assault, or harassment, also has no record of any allegations of sexual abuse, assault, or retaliation sustained by Decedent during his period of incarceration. (*Id*. at ¶ 33.)

## B.  Proffered Expert

Plaintiff has proffered Dr. George C. Klein, Ph.D. ("Dr. Klein"), a retired sociology and anthropology professor, as his expert in this case.  Dr. Klein has a bachelor's degree in

anthropology from the University of Illinois at Chicago Circle, three masters' degrees respectively in urban studies from the University of Chicago, anthropology from Northwestern University, and sociology from the University of Illinois at Chicago Circle, and a Ph.D. in sociology and criminal justice from Union Graduate School in Ohio.  (Onozawa Decl. Ex. H, at 1 ("Dr. Klein CV"); Onozawa Decl. Ex. I, at 71, 74, 76, 78, 80 (Dr. Klein's Deposition Transcript ("Dr. Klein Dep.").)

From 1971 to 2014, Dr. Klein taught courses in anthropology, sociology, social science and social programs on a full-time basis at Oakton Community College in Des Plaines, Illinois. (Dr. Klein CV at 2–3; Dr. Klein Dep. 75–76.)  From 1995 to 2002, and from 2007 to 2008, Dr. Klein was employed as an auxiliary police officer with the Batavia and the Des Plaines Police Departments in Illinois.  (Dr. Klein CV at 3; Dr. Klein Dep. 97, 100–01.)

Dr. Klein does not have a medical degree and he is not a licensed physician.  (Dr. Klein CV; Dr. Klein Dep. 108.)  He has no degree or any training in pharmacology and has no clinical experience with prescribing medications.  (Dr. Klein Dep. 108, 111.)  He has never been engaged in the practice of medicine and has never performed medical procedures on any patients.  (*Id*. at 110.)  He has never taught courses in psychology, psychiatry, clinical diagnosis, or pharmacology.  (*Id*. at 118.)

Dr. Klein participated in a one-year internship from 1986 to 1987 at the University of Illinois at Chicago's Department of Psychiatry, before he wrote his Ph.D. dissertation.  During that internship, Dr. Klein spent three months observing medical residents in training with the Department of Psychiatry, and nine months at a VA hospital under the supervision of a psychiatrist.  (Dr. Klein Dep. 84–85, 94–96.)

Dr. Klein has previously been retained as an expert on police apprehension of the mentally ill and jail suicides. (Dr. Klein CV at 2.) He has been retained as a consultant on issues of mental health and criminal justice by the FBI. (*Id*. at 2.) He has authored publications about the handling of the mentally ill by law enforcement including corrections facilities. (*Id*. at 4–6.)

On May 4, 2018, Dr. Klein submitted an expert report, titled "A Case of Deliberate Indifference and Institutional Negligence: On the Death of Mr. Arbnor Gjini at the Otisville, New York Correctional Institute." (Onozawa Decl. Ex. G ("Dr. Klein Rep.").) Dr. Klein stated that he relied on the depositions in this case and the staff memoranda from the FCI Otisville to draft his report. (Dr. Klein Rep. at 1 n.1.) Dr. Klein testified that he did not review Decedent's medical records. (Dr. Klein Dep. 34–35.)

Dr. Klein testified that the failure at FCI Otisville was a failure to get Decedent the treatment he needed—namely to ensure he was able to see a psychiatrist as soon as Dr. Griffin determined he was delusional and paranoid. (Seeger Decl. Ex. 6, at 122–24 (Dr. Klein's Deposition Transcript ("Dr. Klein Dep.") (Dkt. No. 72-7).)[8] Dr. Klein testified that once Decedent was diagnosed as delusional and paranoid, correctional officers should have become involved in the process of transferring him and ensuring he was safe—instead Dr. Griffin largely handled the situation alone. (Dr. Klein Dep. 183–84, 198–99.) Dr. Klein further testified that the "system failed because of Dr. Sommer's inactions. She was supposed to have set up a situation where memos come to her and she gets them promptly, [that] is the memo . . . to see the psychiatrist, and somewhere it just disappeared." (*Id*. at 191.) Dr. Klein testified that systems

---

[8] The Court cites to Dr. Klein's deposition transcript attached to two separate declarations because the Parties submitted different portions of the transcript. Although Mr. Seeger's declaration is at Dkt. No. 72-7, Plaintiff attaches the transcript of Dr. Klein's deposition at Dkt. No. 72-6. The Court will cite to the relevant page numbers of the transcript only rather than to the separate exhibits.

that could have saved Decedent's life and that should have been in place at a prison, were not in place at FCI Otisville. (*Id.* at 190–91, 194.)

In his report, Dr. Klein proffers several additional opinions, including that the likely diagnosis of Decedent was paranoid schizophrenia, that he was in need of immediate psychiatric treatment, that he should have been prescribed certain anti-psychotic medications, and that he should have been moved to a suicide prevention cell. (Dr. Klein Rep. at 7–9.) Dr. Klein concludes that Dr. Griffin and Dr. Sommer were negligent and deliberately indifferent to Decedent's medical needs. (*Id.* at 9–10.)

C. Procedural History

Plaintiff filed the Complaint on May 25, 2016. (Compl.)[9] Defendant filed an Answer on September 28, 2016, (Dkt. No. 19), after being granted two extensions, (*see* Dkt. Nos. 13, 16). On February 21, 2017, Defendants Dr. Griffin, Bowe, and Dr. Sommers, initially named in Plaintiff's Complaint, each filed motions to dismiss, or alternatively motions for summary judgment. (*See* Dkt. Nos. 28–37.) On June 14, 2017, Plaintiff informed the Court that he did not object to the individual Defendants' motions and that he would pursue the United States as the sole Defendant. (*See* Letter from Stephan E. Seeger, Esq., to Court (Dkt. No. 39).) On June 16, 2017, the Court dismissed all claims against Dr. Griffin, Bowe, and Dr. Sommers. (Dkt. No. 40.)

On July 27, 2017, the Court held an initial pre-trial conference, (*see* Dkt. (minute entry for Jul. 27, 2017)), and issued a case management and scheduling order, (Dkt. No. 48). On November 8, 2017, the case was referred to a Magistrate Judge for general pretrial management. (Dkt. No. 51.) On June 18, 2018, the United States submitted a pre-motion letter to the Court

---

[9] Plaintiff first filed the Complaint in deficient form on May 18, 2016 and May 23, 2016. (*See* Dkt. Nos. 1, 10.)

requesting permission to file a Motion for Summary Judgment.  (*See* Letter from AUSA Tomoko Onozawa, Esq., to Court (Dkt. No. 62).)  On June 20, 2018, the Court granted Defendant's request to file the instant Motion and issued a motion scheduling order.  (Dkt. No. 63.)

On August 10, 2018, the United States filed the instant Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 Statement.  (Not. of Mot.; Def.'s Mem. Law. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 67); Decl. of Joy Aassiddaa ("Aassiddaa Decl.") (Dkt. No. 68); Decl. of David Susney ("Susney Decl.") (Dkt. No. 69); Onozawa Decl.; Def.'s 56.1.)

On September 7, 2018, Plaintiff filed his Opposition to the Motion with the accompanying memorandum of law, exhibits, and a response to Defendant's Rule 56.1 Statement.  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. ("Pl.'s. Mem.") (Dkt. No. 72); Seeger Decl.; Pl.'s 56.1; Pl.'s Additional 56.1.)  On October 10, 2018, the United States filed a reply, a Rule 56.1 Counterstatement, and an additional exhibit.  (Def.'s Reply Mem. Of Law in Further Supp. of Mot. for Summ. J. ("Def.'s Reply") (Dkt. No. 75); Supp. Decl. of Tomoko Onozawa, Esq. ("Onozawa Supp. Decl.") (Dkt. No. 78); Def.'s 56.1 Counter.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (citation and quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation, alteration, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (citation and quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (citation and quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Medical Malpractice or Negligence

The United States argues that the Court should grant summary judgment in its favor because Plaintiff has asserted a medical malpractice claim that requires a qualified opinion from a medical expert and that Dr. Klein is not qualified to give testimony in a medical malpractice case.  (Def.'s Mem. 14.)  Plaintiff counters that his claim is not grounded in medical malpractice but in ordinary negligence, and that Dr. Klein's testimony is admissible on the issue of ordinary negligence and causation.  (Pl.'s Mem. 7, 10.)  The Court must therefore first decide whether this case sounds in ordinary negligence or medical malpractice.

1.  Legal Standard

"[I]t is undisputed that a prisoner, who must rely on prison authorities to treat his medical needs has a fundamental right to reasonable and adequate medical care."  *Powlowski v. Wullich*, 479 N.Y.S.2d 89, 98 (App. Div. 1984) (citations and quotation marks omitted); *see also Kagan v.*

*New York*, 646 N.Y.S.2d 336, 346 (App. Div. 1996) (same).[10]  Under New York Law, the State

owes a duty to render medical care "without undue delay," and may be liable where "delays in

diagnosis and/or treatment [are] a proximate or aggravating cause of [a] claimed injury."

*Marchione v. New York*, 598 N.Y.S.2d 592, 594 (App. Div. 1993) (citation omitted).  When the

medical care provided by the State includes the provision of psychiatric services, the State "is

held to the same duty of care as private individuals and institutions engaged in the same

activity."  *Rattray v. New York*, 636 N.Y.S.2d 43, 44 (App. Div. 1996) (quoting *Schrempf v.*

*State*, 487 N.E.2d 883, 886 (N.Y. 1985)) (holding that the State failed to take proper security

measures and was liable for injuries caused by mental patient who escaped from state psychiatric

institution, where the inmate had a history of recent escapes, self-mutilation, and assaults, and

was left unattended); *see also Andrews v. County of Cayuga*, 947 N.Y.S.2d 698, 699–700 (App.

Div. 2012) (holding that the plaintiff stated a claim for failure to provide adequate medical

treatment, under either a theory of medical malpractice or negligence, where jail officials refused

to give him medication prescribed by a psychiatrist while he was in jail resulting in him having a

seizure and sustaining a shoulder injury); *Horton v. Niagara Falls Mem. Med. Ctr.*, 380

N.Y.S.2d 116, 119–121 (App. Div. 1976) (holding that "a private hospital is required to exercise

reasonable care and diligence in safeguarding a patient," and affirming jury verdict finding

hospital negligent where patient fell from hospital window shortly after construction workers

below his room notified hospital personnel that he was standing on his balcony, and where,

---

[10] New York law applies to Plaintiff's claims under the FTCA because the acts and omissions alleged in his Complaint occurred in New York.  *See Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (holding that United States' liability under the FTCA is limited to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." (quoting 28 U.S.C. § 1346(b)).

among other factors, the hospital personnel knew that he was confused and disoriented (citation omitted)).  "When prison authorities know or should know that a prisoner . . . might physically harm himself, a duty arises to provide reasonable care to assure that such harm does not occur." *Gordon v. City of New York*, 517 N.E.2d 1331, 1332 (N.Y. 1987).

The government's duty to provide medical care and treatment to its prisoners "has been defined in terms of both negligence and medical malpractice."  *Kagan*, 646 N.Y.S.at 342 (citations omitted) (affirming judgment for plaintiff under either theory of medical malpractice or negligence where there was overwhelming evidence that prison medical staff's failure to timely respond to inmate's medical complaints about her infected and bleeding ear resulted in her loss of hearing); *see also Gordon v. City of New York*, 502 N.Y.S.2d 215, 216 (App. Div. 1986) (analyzing plaintiff's claim against prison for not having him examined by a psychiatrist or removed to a proper medical facility to ensure that he would not injure himself as an ordinary negligence claim, because "a duty of ordinary care is owed by prison authorities to provide for the health and care of their charges").

"[T]he distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and no rigid analytical line separates the two." *Naughright v. Weiss*, 857 F. Supp. 2d 462, 474 (S.D.N.Y. 2012) (citation and quotation marks omitted) (analyzing claim against non-physician "zen healer" as one for medical malpractice because the healer performed medical procedures on plaintiff)).  "The distinction . . . turns on whether the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of the common everyday experience of the trier of the facts."  *In re The Brunswick Hosp. Ctr., Inc*., 399 B.R. 582, 588–89 (E.D.N.Y. 2009) (quoting *Miller v.*

*Albany Med. Ctr. Hosp.*, 464 N.Y.S.2d 297, 298–99 (App. Div. 1983)).  In other words, failure to respond to a patient's needs in a timely manner or mishandling a patient sound in ordinary negligence if "the alleged negligent act may be readily determined by the trier of fact based on common knowledge."  *Friedmann v. New York Hosp.-Cornell Med. Ctr.*, 884 N.Y.S.2d 733, 734–35 (App. Div. 2009) (holding that case sounded in ordinary negligence, and not in medical malpractice, where decedent who was bedridden and had skin subject to rupturing died after hospital staff allowed her leg to strike the bed railing causing it to hemorrhage, because a fact-finder could evaluate whether allowing her leg to strike the railing and failing to respond to her calls for help was negligent without the help of expert testimony); *see also Braun v. Lewis*, 953 N.Y.S.2d 12, 14 (App. Div. 2012) (holding that case sounded in ordinary negligence, and not in medical malpractice, where a doctor failed to communicate significant medical findings to decedent's primary care physician following a colonoscopy); *Lipe v. Albany Med. Ctr.*, 925 N.Y.S.2d 258, 259–60 (App. Div. 2011) (holding that case sounded in ordinary negligence, and not in medical malpractice, where patient fell leaving the bathroom following a colonoscopy after the hospital staff ignored her requests for help, because the factual dispute in the case was "whether she received any assistance or assessment at all, not whether the assessment was properly performed").

"In determining whether an action sounds in medical malpractice or simple negligence, the critical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached . . . When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence."  *LaRusso v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 304 (S.D.N.Y. 2013) (citing *Stanley v. Lebetkin*, 507 N.Y.S.2d 468, 468 (App. Div. 1986)); *Hulett v.*

*City of Syracuse*, 253 F. Supp. 3d 462, 505 n.13 (N.D.N.Y. 2017) (same). "[W]hen the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but rather a [provider's] failure to fulfill a different duty, the claim sounds in negligence." *Dispenzieri v. Hillside Psychiatric Hosp.*, 724 N.Y.S.2d 203, 204 (App. Div. 2001) (holding that case sounded in ordinary negligence, and not in medical malpractice, where patient who was admitted to the hospital after a suicide attempt was left unattended and jumped out of a second-floor window, because "[w]hether the defendants breached their duty to exercise due care in their efforts to guard the plaintiff and to prevent another suicide attempt does not depend on an analysis of any medical treatment rendered").

"[W]hen a risk of harm has been identified through the exercise of medical judgment, a failure to take measures to prevent the harm may constitute actionable ordinary negligence." *Kerker v. Hurwitz*, 558 N.Y.S.2d 388, 390 (App. Div. 1990) (citations omitted) (holding that case sounded in ordinary negligence, and not in medical malpractice, where psychiatric patient who had tried to commit suicide on two previous occasions was left unattended and attempted suicide a third time, because "the gravamen [of the plaintiff's complaint] is not negligence in furnishing psychiatric care and treatment to plaintiff, but rather the psychiatrist's breach of a duty to provide for the protection of plaintiff by allowing him to remain in a hospital room with the same sprinkler pipes from which he had previously attempted to hang himself."). "[I]n cases where there is a clear notice of the risk of harm, liability may be imposed without reference to professional standards of care." *Id.* (citations omitted); *see also Carthon v. Buffalo Gen. Hosp.*, 921 N.Y.S.2d 746, 747–48 (App. Div. 2011) (holding that case against a hospital sounded in ordinary negligence, and not in medical malpractice, where decedent's care plan called for him

to be supervised while eating, employees failed to supervise and assist decedent at dinner, and decedent died as a result of choking).

"[W]hile allegations regarding the improper assessment of a patient's condition sound in medical malpractice, allegations regarding the failure of an employee to comply with hospital procedures or standards of ordinary and reasonable care sound in negligence." *In re The Brunswick Hosp. Ctr.*, 399 B.R. at 588–89 (citations omitted); *see also Weiner v. Lenox Hill Hosp.*, 673 N.E.2d 914, 916–17 (N.Y. 1996) (holding that case sounded in ordinary negligence, and not in medical malpractice, where patient contracted AIDS after receiving contaminated blood transfusion because the complaint challenged the hospital's failure to adopt and prescribe proper procedures for the collection of blood, and did not depend on an analysis of the medical treatment provided); *Bleiler v. Bodnar*, 479 N.E.2d 230, 234–36 (N.Y. 1985) (holding that a failure to take proper medical histories constitutes medical malpractice because taking a medical history is a crucial part of diagnosis and treatment, while the failure to provide competent medical personnel or promulgate appropriate emergency room rules constitutes ordinary negligence).

### 2. Application

Here, the gravamen of Plaintiff's Complaint is not with the diagnosis or medical treatment Decedent received, but rather with the failure to act on that diagnosis to provide further necessary treatment and to protect Decedent from himself. Decedent was diagnosed as "paranoid and delusional" on May 6, 2013. (Def.'s 56.1 ¶ 9.) Dr. Griffin was concerned enough at that point to request psychiatric treatment for Decedent, to have him moved out of the SHU, and to have follow-up visits with him. (Pl.'s Additional 56.1 ¶ 4; Def.'s 56.1 ¶ 10; Decedent Psych. Rec. BOP-00122.) Dr. Griffin also expressed urgency in obtaining psychiatric treatment

for Decedent. On May 6, 2013, Dr. Griffin requested that Decedent be scheduled to see a psychiatrist as soon as possible, even before the first available appointment on May 19, 2013, (Pl.'s Additional 56.1 ¶ 4), but Decedent was not seen by a psychiatrist on or before May 19, 2016, because he was not put on the appointment list, (*id*. ¶ 5). On May 21, 2013, Dr. Griffin called and emailed Dr. Sommer to try to get her to see Decedent as soon as possible so that she could "call the psychiatrist and start him on something" because Dr. Griffin believed he "need[ed] something." (*Id*. at ¶ 7.) Despite Dr. Griffin's recommendation, however, Decedent was not placed on the list to see a psychiatrist and did not see a psychiatrist before he committed suicide. (*Id*. at ¶ 23.)

Plaintiff argues that it was negligent, among other things, that there was no psychiatrist on staff at FCI Otisville, that there was no coordination in place to ensure that Dr. Sommer could be reached in case of emergency, and that no ordinary correctional personnel were involved in overseeing Decedent after he was diagnosed as paranoid and delusional. (Pl.'s Mem. 8–9.) These allegations do not involve a matter of medical science and do not hinge on an assessment of the adequacy of the medical treatment provided to Decedent. The existing medical communication and scheduling procedures at FCI Otisville are alleged to have been deficient— and that, as a result, Decedent died. These are claims that sound in ordinary negligence. *See, e.g.*, *Weiner*, 673 N.E.2d at 916–17 (holding that case sounded in ordinary negligence where complaint challenged the hospital's failure to adopt and prescribe proper procedures for the collection of blood); *Bleiler*, 479 N.E.2d at 234–36 (holding that failure to provide competent medical personnel or promulgate appropriate emergency room rules constituted ordinary negligence). Whether Dr. Griffin should have been able to schedule an earlier appointment with a psychiatrist, whether Dr. Griffin should have been able to reach Dr. Sommer on the day

Decedent committed suicide, and whether FCI Otisville should have had a procedure in place to provide emergency psychiatric help, are all questions that do not involve medical science, but that do go to the heart of this case.

Defendant is not alleged to have misdiagnosed Decedent or to have failed to diagnose him as suicidal. Rather, Defendant is alleged to have acted with undue delay in providing medical treatment, or to have failed to provide medical treatment at all, after Dr. Griffin determined Decedent was delusional and paranoid and needed to see a psychiatrist and obtain medication—these too are claims that sound in ordinary negligence. *See, e.g.*, *Carthon*, 921 N.Y.S.2d at 747–48 (holding that case sounded in ordinary negligence where decedent's care plan called for him to be supervised while eating and hospital failed to supervise); *Friedmann*, 884 N.Y.S.2d at 734–35 (holding that case sounded in ordinary negligence where decedent who was bedridden and had skin subject to rupturing died after hospital staff allowed her leg to strike her bed railing); *Kagan,* 646 N.Y.S.2d at 342 (holding that case sounded in ordinary negligence where prisoner complained of ear pain and delay in providing medical treatment resulted in hearing loss). It follows that if a facility may be liable under ordinary negligence for not timely providing medical treatment to an inmate with an ear infection, then a facility may be liable under ordinary negligence for not providing timely treatment to an inmate who has been diagnosed as delusional and paranoid and in need of an appointment with a psychiatrist.[11]

---

[11] The United States also argues that Plaintiff's filings reveal he alleged a medical malpractice claim and not a negligence claim. The United States cites to the administrative complaint Plaintiff filed with the BOP, which states in part "Claimant's death was caused by such action and/or inaction including [the] . . . (1) failure of the prison staff to timely and properly attend to [Decedent's] documented, reported and obvious psychological distress, (2) failure to properly diagnose and/or erroneously misdiagnose and/or properly treat, known medical/psychiatric conditions suffered by [Decedent]." (Def.'s Reply 1–2 (citing Aassiddaa Decl. Ex. A, at GJINI_0004 (Admin. Claim Form. ("SF-95")).) The United States also cites portions of Plaintiff's Complaint in which he asserts that in operating FCI Otisville, the United

23

The United States attempts to distinguish Plaintiff's case from *Dispenzieri* and *Kerker*, arguing that those cases sounded in ordinary negligence because the patients were clearly diagnosed suicide risks, whereas here it was not well-established that Decedent posed a risk to himself. (Def.'s Reply 4–5.) This argument misses the mark. First, a duty to provide timely medical treatment and to protect a patient from harming himself does not arise only in cases where an inmate is a clear suicide risk, but in a variety of cases, for example where an inmate has ear pain, *see Kagan*, 646 N.Y.S.at 342 (holding that state had duty to provide medical care to inmate with bleeding and infected ear), or where a patient has a skin condition, *see Friedmann*, 884 N.Y.S.2d at 734–35 (holding that hospital had duty to exercise reasonable care and not allow patient's leg to strike bed railing where patient had skin subject to rupturing). Moreover, neither

_____

States held itself out as capable of providing psychiatric services using "that degree of care, skill, diligence, and attention used by psychiatric service providers generally in the community," and that Dr. Griffin and Dr. Sommer also held themselves out as a psychologist and a physician respectively who would exercise a standard of care expected of them in their professions. (Def.'s Reply 2 (citing Compl. ¶¶ 10, 13, 19).) Finally, the United States cites the portion of the Complaint where Plaintiff alleges that Defendants breached their duty by, "[f]ailing to properly diagnose the Decedent's psychiatric illness; [] [f]ailing to provide the Decedent with access to psychiatric services and/or treatment; [] [f]ailing to recognize that the Decedent was a danger to himself and was likely to commit suicide; [] [f]ailing to properly treat the Decedent's psychiatric illness." (Def.'s Reply 2 (citing Compl. ¶ 53).)

    Contrary to the United States' argument, however, Plaintiff's filings clearly state that the prison medical staff knew that Decedent was paranoid and delusional and in need of medical treatment, and that they failed to act on this diagnosis. The Complaint also alleges that Defendant failed "to provide the Decedent with access to psychiatric services and/or treatment" and failed "to properly treat the Decedent's psychiatric illness." (Compl. ¶ 53.) The Complaint does not hinge entirely on medical science and an assessment of the medical treatment provided to Plaintiff. That portions of Plaintiff's filings could also be construed as alleging a medical malpractice claim, or that Plaintiff submits evidence that was intended to support a medical malpractice claim, such as portions of Dr. Klein's testimony, does not negate the fact that Plaintiff sufficiently makes out an ordinary negligence claim. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) (holding that pursuant to Federal Rule of Civil Procedure 8(d)(3) "the plaintiff is at liberty to plead different theories, even if they are inconsistent with one another, and the court must accept each sufficiently pleaded theory at face value, without regard to its inconsistency with other parts of the complaint.").

the *Dispenzieri* or *Kerker* courts based their decisions on the plaintiff being a clear suicide risk. In *Dispenzieri*, the court reasoned that the case sounded in ordinary negligence because "[w]hether the defendants breached their duty to exercise due care in their efforts to guard the plaintiff . . . does not depend on an analysis of any medical treatment rendered." 724 N.Y.S.2d at 204. The court's reasoning did not hinge on the plaintiff being a clear suicide risk—it hinged on the fact that the analysis of the duty to exercise due care in guarding the plaintiff did not require analysis of the medical treatment that was provided. As the Court explained, "the acts or omissions complained of [did not] involve a matter of medical science or art requiring special skills . . . [and could] instead be assessed on the basis of the common everyday experience of the trier of the facts." *In re The Brunswick Hosp. Ctr.*, 399 B.R. at 588–89 (quoting *Miller*, 464 N.Y.S.2d at 298–299). Similarly in *Kerker*, the court reasoned that the case sounded in ordinary negligence because "the issue of negligence [could] readily [be] determinable by a trier of fact evaluating the evidence based on common knowledge," because "the gravamen [of the plaintiff's complaint] [was] not negligence in furnishing psychiatric care and treatment to plaintiff, but rather the psychiatrist's breach of a duty to provide for the protection of plaintiff." 558 N.Y.S.2d at 390 (citations omitted).

Here too, analyzing whether Defendant exercised due care in guarding Decedent does not require analysis of the medical treatment provided to him. Once Dr. Griffin determined that Decedent was delusional and paranoid and urgently needed to be seen by a psychiatrist and prescribed medication, the prison had a duty to render medical care "without undue delay," *Marchione*, 598 N.Y.S.2d at 594, and "to exercise due care in their efforts to guard [Decedent]," *Dispenzieri*, 724 N.Y.S.2d at 204; *see also Gordon*, 517 N.E.2d at 1332 ("When prison authorities know or should know that a prisoner . . . might physically harm himself, a duty arises

to provide reasonable care to assure that such harm does not occur.").  A fact finder could

evaluate, based on common knowledge and experience, whether Defendant breached the duty of

care to provide timely medical treatment and to protect Decedent once it was clear that Decedent

was delusional and paranoid and in need of urgent psychiatric treatment.  The Court thus

concludes that Plaintiff's claim sounds in ordinary negligence.[12]

The only argument the United States offered on the merits of Plaintiff's negligence claim

was that Plaintiff's expert is not qualified.  The United States did not submit evidence or argue

that there is no factual dispute as to whether under an ordinary negligence analysis FCI Otisville

and its employees owed Decedent a duty of care, whether they breached that duty, or whether

that breach caused Decedent's death.  *See Sackin v. TransPerfectGlobal, Inc*., 278 F. Supp. 3d

739, 747 (2d Cir. 2017) ("Under New York law, in order to recover on a claim for negligence, a

plaintiff must show (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of

this duty; and (3) injury to the plaintiff as a result thereof." (quoting *Caronia v. Philip Morris*

*USA, Inc*., 715 F.3d 417, 428 (2d Cir. 2013)).  "It is the movant's burden to show that no genuine

factual dispute exists."  *Vt. Teddy Bear Co.*, 373 F.3d at 244.  The United States has failed to

"point to a lack of evidence . . . on an essential element of the nonmovant's claim," *CILP*

*Assocs., L.P.*, 735 F.3d at 123, as it did not argue the sufficiency of Plaintiff's evidence as to any

---

[12] The Court does not address the United States' argument that Plaintiff cannot proceed on a claim of "ministerial neglect," (*see* Def.'s Mem. 5–8), because the Court has determined that Plaintiff's claim sounds in ordinary negligence.  The Court also does not understand Plaintiff to have argued that his claims are based on ministerial neglect, as he expressly argued to the contrary that his claims are based on ordinary negligence, and only mentioned ministerial neglect in passing in describing the holdings of cases that referenced the concept.  (*See* Pl.'s Mem. 7–10).

of the elements of a claim sounding in ordinary negligence. The Court therefore denies the

United States' Motion for Summary Judgment with respect to Plaintiff's negligence claim.[13]

## C. Expert Testimony

The United States argues that Dr. Klein, Plaintiff's proposed expert, is not qualified to

offer any medical opinions and that his expert report is unreliable and should be found

---

[13] The Court notes that Plaintiff will likely face an uphill battle in proving some of the elements of a negligence claim. "Whether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant's acts or omissions. If no [injury] could have been reasonably foreseen, or if defendant's conduct was reasonable in light of what could have been anticipated, there is no breach of duty, [and] no negligence." *Gordon*, 517 N.E.2d at 1332 (citation omitted) (holding that it was not reasonably foreseeable that an arrestee who had been placed in a bare holding cell, without belt or shoelaces, and with a correction officer seated directly outside his cell monitoring him, would suddenly scale the bars of his cell and plunge headfirst into the toilet bowl, even though he had exhibited boisterous, irrational and delusional behavior). The United States may well argue that it was not foreseeable that Decedent would kill himself in the absence of immediate medical treatment, and that it is not clear that Decedent's suicide could have been prevented even if he had been seen by the psychiatrists sooner and been prescribed medication. However, the United States did not "point to a lack of evidence" on any negligence element, *CILP Assocs., L.P.*, 735 F.3d at 123, and the Court will not decide whether Plaintiff's negligence claim survives the summary judgment stage without having received Rule 56.1 materials and briefing from the Parties on this point.

In any event, "questions concerning what is foreseeable . . . generally are for the fact finder to resolve." *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980); *see also Turturro v. City of New York*, 68 N.E.3d 693, 704 (N.Y. 2016) (same). And "whether the defendant or the plaintiff acted reasonably under the circumstances . . . can rarely be decided as a matter of law." *Andre v. Pomeroy*, 320 N.E.2d 853, 855 (N.Y. 1974); *see also De Cristofaro v. Joann Enterprises Inc.*, 672 N.Y.S.2d 950, 951 (App. Div. 1998) ("In negligence actions, even when facts are conceded by the parties, there will often remain a question of fact whether the party in question acted reasonably under the circumstances." (citations omitted)); *Horton*, 380 N.Y.S.2d at 120 ("[W]hat reasonable care [i]s required in the way of supervision, [depends on] the nature of the hospital and its facilities, the personnel available either by way of staff, private duty nurses or relatives, and the knowledge the hospital had of the patient's propensities to inflict injury upon himself . . . even though . . . the patient's conduct may not have been suicidal." (citation omitted)). Thus, it is not for the Court at this stage, to determine whether Defendant exercised reasonable care, or whether Decedent's suicide was foreseeable. *Cf. Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005) (noting that the "general rule" is that "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage.").

inadmissible under Rule 702 of the Federal Rules of Evidence.  (Def.'s Mem. 14–19; Def.'s Reply 8–9.)  The United States also argues that Dr. Klein makes improper conclusions of law, and fact, and provides several irrelevant opinions.  (Def.'s Mem. 20–22.)  Plaintiff counters that Dr. Klein should be permitted to testify on the issue of ordinary negligence, specifically on the alleged institutional failures at FCI Otisville in securing treatment and safety for Decedent after he was diagnosed as delusional and paranoid.  (Pl.'s Mem. 10–13.)

1.  Legal Standard

At the summary judgment stage, a court can "decide questions regarding the admissibility of evidence, including expert opinion evidence[.]"  *Bah v. Nordson Corp.*, No. 00-CV-9060, 2005 WL 1813023, *6 (S.D.N.Y. Aug. 1, 2005) (citation omitted).  "If a proffer of expert testimony is excluded as inadmissible pursuant to [Federal Rule of Evidence] 702, the court must make the summary judgment determination on a record that does not include that evidence." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Although it is the role of the jury to determine the credibility of an expert witness, it is the role of the trial court to serve as a "gatekeeper" to ensure that the expert testimony is reliable and relevant before it is presented to the jury.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (finding that the trial judge's gatekeeping obligation applies to all expert testimony); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)

(holding that the district court must ensure that a witness is qualified as an expert and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n.10); *LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016) (same). "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]" *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (citation omitted); *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLV*, 571 F.3d 206, 213 (2d Cir. 2009) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous." (citations omitted)).

### 2. Dr. Klein's Qualifications

The Court must first address "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (citation and quotation marks omitted). In doing this, the Court asks "whether the proffered expert has the educational background or training in a relevant field . . . by looking at the totality of the witness's background." *Arista Records LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (citations, alteration, and quotation marks omitted). The Court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," to "ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Id.* (citations, alteration, and quotation marks omitted). Courts in the Second Circuit liberally construe the

expert qualifications requirement, and generally will not exclude expert testimony provided "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." (citation omitted)).

The Court has already ruled that Plaintiff's case sounds in ordinary negligence and he therefore does not need to present a *medical expert*. However, inasmuch as Plaintiff seeks to present Dr. Klein as a medical expert, the Court now also rules that Dr. Klein is not qualified to serve as a medical expert. Although a medical expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury, he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *Loyd v. United States*, No. 08-CV-9016, 2011 WL 1327043, at *5, *7 (S.D.N.Y. Mar. 31, 2011) (citations and quotation marks omitted) (holding that an internist and infectious disease specialist was not qualified to testify on neurological disorders); *see also In re Fosamax Prods. Liab. Litig.*, No. 06-CV-7631, 2009 WL 4042769, at *6 (S.D.N.Y. Nov. 23, 2009) (noting that doctors need not be "specialist[s] in the exact area of medicine implicated by the plaintiff's injury") (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995)), *aff'd sub nom. Flemings v. Merck & Co.*, 399 F. App'x 672 (2d Cir. 2010). Dr. Klein has no medical education, training, or experience whatsoever. (Dr. Klein CV; Dr. Klein Dep. 108, 110.) Nor does he have a degree or any training in pharmacology or clinical experience with prescribing medications, (Dr. Klein Dep. 108, 111), and he has never been engaged in the practice of

medicine and has never performed medical procedures on any patients, (*id*. at 110).[14]  Therefore

Dr. Klein is not qualified to testify as a medical expert.

Whether Dr. Klein can testify as an expert regarding a prison's institutional failures in

handling a mentally ill inmate is a separate question.  Plaintiff does not cite any caselaw in the

Second Circuit in which a proposed expert without *any* experience in prison administration or

management was qualified to testify on jail standards or procedures or institutional failures.  And

indeed the Court is not aware of such a case.  Instead, the Court has only found cases in which

such experts were approved based on qualifications and experience in prison practices and/or

administration.  *See, e.g.*, *Marria v. Broaddus*, 200 F. Supp. 2d 280, 287–88 (S.D.N.Y. 2002)

(holding that a prison warden with 20 years of experience managing prison populations, with a

PhD in sociology with a focus on criminal justice, who taught courses on criminal justice

management, was qualified to testify on whether allowing prisoners to receive a certain

publication threatened the order of that prison); *see also DuBois v. Bd. of Cty. Comm'rs of Mayes

Cty.*, No. 12-CV-677, 2016 WL 907971, at *2 (N.D. Okla. Mar. 9, 2016) (holding that proposed

expert who had written policy handbooks for jail administrators, had significant experience with

jail training, staffing, and standards, worked for 29 years in law enforcement and for part of that

as a deputy director of corrections, and was an adjunct instructor in criminal justice, was

qualified to "render testimony as it relates to the field of jail operations and correctional staffing,

policies, procedures, and standards"); *Kretek v. Bd. of Comm'rs. of Luna Cty.*, No. 11-CV-676,

2014 WL 11621696, *1–2 (D.N.M. Feb. 26, 2014) (holding that a sociologist and associate

professor of criminology with 20 years of experience in correctional administration, including 13

---

[14] Given Dr. Klein's utter lack of medical training, it is unsurprising that he did not
review Decedent's medical records.  (*See* Dr. Klein Dep. 34–35.)

years in jail management, was qualified to testify on "what the national jail standards are regarding the management of jails, the supervision of detention officers, and the training of detention officers," but that he was not qualified as a medical expert and could therefore not testify regarding the adequacy of the medical care plaintiff received).

Dr. Klein was a professor of anthropology, sociology, and social science from 1971 to 2014, (Dr. Klein CV at 1; Dr. Klein Dep. 75–76), and has authored numerous publications about the handling of the mentally ill by law enforcement including corrections facilities, (Dr. Klein CV at 4–6). Although he has previously been retained as an expert on police apprehension of the mentally ill and jail suicides, (*id.* at 2), and as a consultant on issues of mental health and criminal justice by the FBI, (*id.*), he does not have any experience with jail administration or management. His law enforcement experience is limited to having been an auxiliary police officer with from 1995 to 2002, and from 2007 to 2008. (*Id.* at 3; Dr. Klein Dep. 97, 100–01.) "[L]looking at the totality of [Dr. Klein's] background," *Arista Records LLC*, 2011 WL 1674796, at *2, the Court concludes that Dr. Klein does not have the "knowledge, skill, experience, training, or education," *Nimely*, 414 F.3d at 396 n.11, required to testify on the prison procedures and institutional failures at FCI Otisville.

Because the Court concludes that Dr. Klein is not qualified to testify as a medical expert nor as an expert on prison standards or prison institutional failures, and because Plaintiff did not propose to offer his testimony on any other subjects, nor did Dr. Klein's report or testimony touch or any other subjects, his expert testimony is excluded.

### 3. The Reliability of Dr. Klein's Testimony

Because the Court concludes that Dr. Klein does not meet that "threshold" requirement of being qualified to testify, *see Nimely*, 414 F.3d at 396 n.11, it need not analyze whether his

testimony is reliable. The Court briefly notes, however, that there are also serious concerns about the reliability of Dr. Klein's testimony.

"In determining whether an expert's opinion should be excluded as unreliable, 'the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Houser v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 470, 475 (W.D.N.Y. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) (citing Fed. R. Evid. 702). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely*, 414 F.3d at 396 (italics omitted) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (citation omitted).

Dr. Klein summarily cites to a study by a jail and suicide expert for the proposition that "the assessment of jail or prison suicide risk must be an on-going process," and that this process should be collaborative between the medical, mental health, and the correctional staff. (Dr. Klein Rep. 9.) He criticizes FCI Otisville for not having a suicide screening system in place and argues that "[Dr.] Griffin should have formally informed the correctional officers that [Decedent]

was paranoid and delusional." (*Id*.) He concludes that this lack of collaboration was an example of deliberate indifference. (*Id*.) Dr. Klein also summarily cites to a study describing "suicide resistant cells" that prisoners are sometimes placed in if they are on suicide watch. He also cites a study that describes the dangers of metal frame bunk beds in prisons and how they provide an accessible place for suicide attempts. (*Id*. at 10.) He concludes that the existence of "suicide resistant cells" "would likely have prevented [Decedent's] suicide." (*Id*.)

Dr. Klein does not cite to any jail standard or code applicable in New York or elsewhere in the country. He does not explain what the reasonable standard of care with respect to suicide prevention in prisons is, and he does not explain how FCI Otisville deviated from those standards. He does not explain whether all prisons in New York are required to have "suicide screening" procedures and "suicide resistant cells" and whether it is a deviation from the standard of care to not have them in place. He does not explain what principles or methods he applied, or how he reached his conclusions. In short, the Court is unable to discern "how [Dr. Klein] came to his conclusion[s] and what methodologies or evidence substantiate that conclusion." *Riegel*, 451 F.3d at 127. *Compare Cox v. Glanz*, No. 11-CV-457, 2014 WL 916644, at *6 (N.D. Okla. Mar. 10, 2014) (excluding "jail standards" expert's testimony because his opinions were not helpful to the trier of fact because they were unconnected to any identifiable standards and merely amounted to testimony on an ultimate issue of law), *and Poore v. Glanz*, No. 11-CV-797, 2014 WL 4263225, at *4 (N.D. Okla. Aug. 29, 2014) (holding that jail standards expert testimony was reliable because he identified the standards on which he relied, including "his education, training, and 29 years of correctional experience, as well as knowledge of jail standards in Ohio and nationwide, the Standards for Adult Local Detention Facilities, the Oklahoma Administrative Code . . . and Core Jail Standards . . . promulgated by the American

Correctional Association"); *see also Marria*, 200 F. Supp. 2d at 288 (concluding that expert's testimony was reliable where expert did not survey the prison system in question and did not consult literature on prison gang management because his 20 years of experience in correctional management qualified him to base his opinion on his own experience).

Moreover, concluding that the existence of "suicide resistant cells" could have prevented Decedent's suicide is an improper factual conclusion reserved for the fact-finder. *In re Rezulin*, 309 F. Supp. 2d at 541 (noting that under Rule 702 an expert witness may not testify about "lay matters which a jury is capable of understanding and deciding without the expert's help" (quoting *Andrews v. Metro North Commuter R.R. Co*., 882 F.2d 705, 708 (2d Cir. 1989)); *see also S.R. ex rel. M.R. v. Turnbull*, No. 12-CV-1052, 2013 WL 1285411, at *2 (S.D.N.Y. Mar. 28, 2013) (holding that expert medical testimony was not necessary to prove that assault and battery happened). Furthermore, concluding that the absence of a suicide screening system was an example of deliberate indifference is an improper legal conclusion reserved for the Court. *See Scott v. Chipotle Mexican Grill, Inc*., 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (stating that "an expert 'may not give testimony stating ultimate legal conclusions'" (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991))).[15]  *See also Nimely*, 414 F.3d at 397 (holding that "expert

---

[15] Dr. Klein also cites to what appear to be studies in the portions of his report in which he offers medical opinions. In the portion of his report where he opines that Dr. Sommer should have also considered prescribing Clozapine, he cited "Aguilar, et al., 2008; Meltzer, et al., 2003; Gobbi, 2003," but without explaining the findings of these studies. (Dr. Klein Rep. 7 n.6.) This is a medical opinion that Dr. Klein, as someone with no medical or pharmacological education, training, or experience, is not qualified to make. He also cites to a Human Rights Watch study and a Joyful Heart Foundation study describing the physical and psychological symptoms victims of prison rape exhibit. Based on these studies he concludes Decedent was likely sexually assaulted. (Dr. Klein Rep. 8.) Not only is this statement an improper medical opinion, it is also an improper factual determination reserved for the fact-finder. *See In re Rezulin*, 309 F. Supp. 2d at 541; *see also S.R. ex rel. M.R.*, 2013 WL 1285411, at *2. Moreover, the Court is puzzled as to how Dr. Klein arrives at these conclusions about what medication Decedent should have

testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach" (citations, alterations, and quotation marks omitted)).

The Court concludes that even if Dr. Klein were qualified to testify, his testimony would have to be excluded as unreliable.

### D.  Failure to Protect Claim

The United States argues that the Court should grant summary judgment in its favor with respect to Plaintiff's failure to protect claim because Plaintiff has proffered no evidence that BOP personnel were aware of any reasonably foreseeable physical or sexual assault on Decedent. (Def.'s Mem. 22–25.)  Plaintiff does not respond to this argument in his opposition.

"Under New York law, for a prisoner to recover for negligence for failure to protect him from another inmate's assault, he must demonstrate that the prison officials failed to provide adequate supervision to prevent that which was 'reasonably foreseeable.'"  *Smith v. Chief Exec. Officer*, No. 00-CV-2521, 2001 WL 1035136, *6 (S.D.N.Y. Sept. 7, 2001) (dismissing FTCA failure to protect claim because plaintiff failed to allege attack on him by other prisoner was reasonably foreseeable where plaintiff had no prior physical altercation with the attacker, and the attacker was not a known dangerous prisoner (citations omitted)); *see also Pierrelouis v. State*, 682 N.Y.S.2d 110, 111–12 (App. Div. 1998) (affirming dismissal of failure to protect claim against prison official where attack on plaintiff was not reasonably foreseeable in part because the official was not aware of any history or prior incidents between plaintiff and the attacker);

---

been prescribed and what medical conditions his symptoms corresponded to given that he did not review Decedent's medical record.  (Dr. Klein Dep.  34–35.)

*Padgett v. State*, 558 N.Y.S.2d 433, 434 (App. Div. 1990) (affirming summary judgment for defendant on failure to protect claim where plaintiff "failed to submit evidentiary material sufficient to raise a triable issue of fact on the issue of foreseeability," and failed to show that prison officials "had notice of an especially dangerous situation"); *Dizak v. State*, 508 N.Y.S.2d 290, 292 (App. Div. 1986) (affirming dismissal of failure to protect case where assault against decedent was not reasonably foreseeable even where attacker had a dozen misbehavior reports because there was no evidence decedent and attacker knew each other or had previous interactions, and the attackers previous incidents were mostly non-violent).

Here, Decedent's medical records at FCI Otisville show no injuries consistent with assault or rape, Decedent did not present any issues of concern through the BOP's Administrative Remedy Program, and the Special Investigative Services Department at FCI Otisville has no record of any allegations of sexual abuse, assault, or retaliation sustained by Decedent.  (Def.'s 56.1 ¶¶ 31–33.)  Moreover, Decedent did not report any physical or sexual assaults to Dr. Griffin.  (*Id*. at ¶ 11.)  And, Plaintiff did not notify BOP of the alleged rape, did not file any reports with or document the alleged rape for the BOP, and does not know whether Decedent ultimately reported the alleged rape to anyone at FCI Otisville.  (*Id*. at ¶¶ 27–29.) Plaintiff also does not have any photographic or documentary evidence about any abuse Decedent suffered.  (*Id*. at ¶ 30.)  Moreover, Plaintiff does not and indeed cannot allege, let alone prove, who the purported assailant was, what BOP knew or should have known about him, or what BOP knew or should have known about the attacker's interactions with Decedent. "Without a sufficient showing that [the] assault against [Decedent] was reasonably foreseeable and avoidable, there is no evidentiary basis to support a rational determination that [Plaintiff] has satisfied the requirements of an action for negligence under New York law, an essential element

of which is [D]efendant's breach of a duty owed to plaintiff that causes a reasonably foreseeable injury to [P]laintiff." *Marshall v. United States*, 242 F. Supp. 2d 395, 397–98 (S.D.N.Y. 2003) (citations omitted) (granting summary judgment because plaintiff presented "no evidence whatsoever" that any BOP employees saw the other inmate approaching to attack plaintiff or that there was a prior incident or existing relationship between plaintiff and attacker).

Plaintiff has failed to demonstrate that it was reasonably foreseeable to anyone at FCI Otisville that Decedent was or would be physically or sexually assaulted. The Court therefore grants the United States' Motion for Summary Judgment with respect to Plaintiff's failure to protect claim.

### III. Conclusion

For the foregoing reasons, the Court denies the United States' Motion for Summary Judgment as to Plaintiff's negligence claim, grants the Motion with respect to excluding Dr. Klein's expert testimony, and grants the Motion as to the Failure to Protect Claim. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 66.) The Court will hold a Status Conference on March 7, 2019 at 3:00 p.m.

SO ORDERED.

DATED:      February $\underline{8}$ , 2019
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE